**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

NEW YORK KNICKS, LLC,

            Plaintiff,

            v.

MAPLE LEAF SPORTS & ENTERTAINMENT
LTD. d/b/a TORONTO RAPTORS, DARKO
RAJAKOVIĆ, NOAH LEWIS, IKECHUKWU
AZOTAM, and JOHN DOES 1-10.

            Defendants.

**Civil Action No.:**  1:23-cv-7394

**COMPLAINT**

---

Plaintiff New York Knicks, LLC ("Knicks"), by and through their undersigned counsel, hereby alleges, based on knowledge as to their own conduct, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.    This case involves the theft of proprietary information by a former Knicks employee, Ikechukwu Azotam ("Azotam"), who illegally procured and then disclosed proprietary information to employees of a competing National Basketball Association ("NBA") franchise, the Toronto Raptors ("Raptors"), including Raptors head coach, Darko Rajaković ("Rajaković"), player development coach, Noah Lewis ("Lewis"), and John Does "1" through "10," currently unknown Raptors employees who obtained Knicks propriety information (collectively, the "Raptors Defendants"), direct competitors of the Knicks.

2.    The Raptors Defendants directed Azotam's actions and/or knowingly benefited from Azotam's wrongful acts.

3.     Azotam worked for the Knicks from October 2020 until August 2023, first as an Assistant Video Coordinator and then as a Director of Video/Analytics/Player Development Assistant.

4.     While employed by the Knicks, Azotam signed an Employment Agreement containing a confidentiality clause requiring him to maintain the secrecy of all confidential or proprietary Knicks information (the "Agreement").

5.     Azotam also acknowledged a company information usage policy during his tenure with the Knicks that expressly forbids the misappropriation of confidential and proprietary information.

6.     In or around June 2023, the Raptors began recruiting Azotam to join their organization.

7.     Defendant Rajaković, the head coach of the Raptors, had never previously served as an NBA head coach.

8.     To assist this novice coach in doing his job, Defendant Rajaković and the other Raptors Defendants conspired to use Azotam's position as a current Knicks insider to funnel proprietary information to the Raptors to help them organize, plan, and structure the new coaching and video operations staff.

9.     In late July 2023, Azotam informed the Knicks that he had received an offer of employment from the Raptors.  Around the same time, Azotam began secretly forwarding proprietary information from his Knicks email account to his personal Gmail account, which he then shared with the Raptors Defendants.

10.     These materials included scouting reports, play frequency reports, a prep book, and a link to third-party licensed software.

11.     This material consists of secret, proprietary information critical to the Knicks' efforts to maintain a competitive advantage over their rivals, including the Raptors.  The Knicks take their cybersecurity very seriously and take great precautions to preserve the secrecy of their confidential information.

12.     In addition, and in direct violation of the Agreement and company policies, the Raptors Defendants directed Azotam to misuse his access to the Knicks' subscription to Synergy Sports to create and then transfer to the Raptors Defendants over 3,000 files consisting of film information and data.

13.     On August 15, 2023, the Knicks' insider threat security team identified the theft, and Knicks' records show that the stolen files were accessed over 2,000 times by the Raptors Defendants.

14.     The Knicks have been harmed by this theft and will continue to be harmed if this misconduct is not enjoined by this Court.

## PARTIES

15.     Plaintiff New York Knicks, LLC is a New York-based company that owns and operates the New York Knicks, a professional basketball team in the NBA.

16.     Defendant Maple Leaf Sports & Entertainment Ltd. ("MSLE") is a professional sports and commercial real estate company based in Toronto, Ontario, in Canada.  MSLE owns and operates the Toronto Raptors, a professional basketball team in the NBA.

17.     Defendant Darko Rajaković is the head coach of the Toronto Raptors.  He is based in Toronto, Ontario, in Canada.

18.     Defendant Noah Lewis is a player development coach for the Toronto Raptors.  He is based in Toronto, Ontario, in Canada.

19.     Defendant Ikechukwu Azotam is a former Director of Video/Analytics/Player Development Assistant for the Knicks and a current employee of the Toronto Raptors.  At the time of the conduct at issue in this complaint, Azotam was based in Tarrytown, New York.

20.     John Does "1" through "10," representing currently unknown Toronto Raptors employees who improperly obtained Knicks proprietary information, and at all relevant times were employed by the Raptors in Toronto, Ontario, in Canada.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action seeks to enforce rights and remedies secured under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030, 1030(g), *et seq.*, and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1832 and 1836, *et seq.*

22.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the New York law claims in this action.

23.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTS

### A.  Background

24.     The Knicks is a New York-based company that owns and operates the New York Knicks, a member of and one of the 30 teams in the NBA, a professional basketball league.

25.     From October 5, 2020 until August 14, 2023, Azotam was a salaried employee of the Knicks.

26.     Azotam initially served as an Assistant Video Coordinator planning, editing and producing video packaging used by the Knicks coaching staff for scouting, recruiting and game

preparation purposes from October 2020 until being promoted to Director of Video/Analytics/Player Development Assistant in August 2021.

27.    After the promotion, Azotam oversaw the Assistant Video Coordinators and was responsible for planning, organizing and distributing all video scouting responsibilities for the Knicks coaching staff.

28.    Initially, Azotam signed a one-year contract (the "Employment Agreement"), earning a base salary plus a playoff bonus if the Knicks made the playoffs.

29.    On August 23, 2021, Azotam executed an amendment to the Employment Agreement (the "Amendment").  The Amendment changed Azotam's title to Director of Video/Analytics/Player Development Assistant.  The Amendment also extended his employment term to a period from August 15, 2021 through August 14, 2023 and provided an option for the Knicks to extend the employment term through August 14, 2024 at the team's discretion.

30.    The Employment Agreement contained the following provision concerning confidentiality (Section 8, emphasis added):

> At all times during and after the Employment Term, **Employee shall maintain in strictest confidence all confidential or proprietary information concerning the Company or its businesses or organizations** (in any form including, without limitation, confidential or proprietary information which is oral, written, digital or in any other format). As used herein, "**confidential or proprietary information**" includes, without limitation, financial data; customer, guest, vendor or shareholder lists or data; advertising, business, sales or marketing plans, **tactics and strategies; economic or commercially sensitive information**, policies, practices, procedures or techniques; **trade secrets; play books; scouting reports; draft strategies; trade strategies; player injuries or medical conditions**; information about the Company's affiliates, employees, directors, officers, players, coaches or rights, or any other non-public information relating to the Company's business activities, ventures or operations. **Following any termination (without regard to the reason therefor) or expiration of Employee's employment hereunder, Employee (a)**

**shall return to the Company all tangible iterations of confidential or proprietary information then in his possession or under his control, and (b) shall not, except as required by compulsion of legal process, use or make any such information available for any purpose other than with the written permission of the Company.** If Employee is required to disclose any confidential or proprietary information due to compulsion of legal process, he shall immediately inform the Company of such compulsion, and he shall cooperate with all efforts by the Company to obtain a protective order or other appropriate remedy. If such order or other remedy is not obtained by the Company, Employee shall only furnish that specific confidential or proprietary information which is legally required.

31.    On or around July 25, 2023, Azotam informed the Knicks that he had received an offer from the Raptors and planned to take it for the following year.

32.    Azotam's last day as a Knicks employee was August 14, 2023.

**B.  The Raptors Conspire with Azotam to Acquire Knicks Proprietary Information**

33.    On or around June 13, 2023, the Raptors hired Defendant Rajaković to be their head coach.

34.    Defendant Rajaković had no prior experience as a head coach in the NBA.

35.    As a novice NBA head coach, Defendant Rajaković began hiring individuals to build out his new staff.

36.    As a first time NBA head coach, Defendant Rajaković would be expected to bring his own organizational structure and coaching method.  Apparently, given his non-traditional path to his head coaching job, Defendant Rajaković did not have his own, so he chose to exploit the Knicks' methods.

37.    In July 2023, Azotam began speaking with Defendant Rajaković and the Raptors Defendants about a possible position on their staff.

38.     Defendant Rajaković and the other Raptor Defendants recruited and used Azotam to serve as a mole within the Knicks organization to convey information that would assist the Raptors Defendants in trying to manage their team.

39.     In early August 2023, Azotam began to illegally convert and misappropriate the Knicks' confidential and proprietary data.  This theft of data was done at the direction of Defendant Rajaković and the Raptors Defendants.

40.     On August 11, 2023, Azotam sent two emails from his Knicks email address to his new Raptors email address at iazotam@torontoraptors.com.  In each case, the emails contained proprietary information with highly confidential material.  He subsequently provided this material to the Raptors Defendants at their request, including:

41.     One email, with the subject line "FW: INDIANA GAME 82" contained several documents, including:

     a.  an advanced scouting report of the Indiana Pacers players with team and player statistics, key plays and play frequency data, specific player tendencies and scouting, strategy analyses with offensive/defensive notes, play breakdowns, opposition play research, and transition;

     b.  comprehensive diagrams of over 250 Pacers' plays, a spreadsheet containing play frequency statistics; and

     c.  a spreadsheet containing the Pacers' play calls for a specific game broken down by game time.

42.     The second email with the subject line  "FW: DENVER ADVANCE SCOUT REPORT" contained several documents, including:

a.  an advanced scouting report of the Denver Nuggets players with team and player statistics, key plays and play frequency data, specific player tendencies and scouting, strategy analyses with offensive/defensive notes, play breakdowns, opposition play research, and transition;

b.  comprehensive diagrams of over 270 Nuggets' plays, a spreadsheet containing play frequency statistics; and

c.  multiple spreadsheets containing the Nuggets' play calls for specific games broken down by game time.

43.     Azotam also emailed his personal email address several documents containing additional proprietary Knicks information.  He provided this material to the Raptors Defendants at their request, including:

a.  the prep book for the 2022-23 season includes confidential information related to the Knicks' process for planning its season, including the template and organizational structure that the Knicks used to plan and assign scouting responsibilities; and

b.  a play frequency report for the Dallas Mavericks, which consisted of a spreadsheet showing the plays and the frequency with which the Mavericks ran those plays during specific games.  The Knicks used this information to prepare for their game against the Mavericks.

44.     The information described above that was shared with the Raptors Defendants constitutes secret proprietary information compiled by the Knicks coaching staff.  Scouting reports, play frequency data, opposition research, opposing play tendencies, lists of opponents' key plays, diagrams of opponents' key plays, and the Knicks' prep book are all information that is

critical to the Knicks scouting apparatus and greatly aids the team in preparing for games against its opponents.  This material is confidential, competitively sensitive, and valuable to the Knicks.

45.     For example, scouting reports are widely recognized in all major sports leagues as some of the most secretive and important pieces of proprietary information, and are clearly protectable trade secrets.[1]

46.     In a recent survey of the in-house counsel for the teams in the four major North American sports leagues (basketball, baseball, football, hockey), approximately 90% of the respondents said that they would assert trade secret protection over scouting reports.[2]

47.     In addition, on August 2, 2023, Azotam sent an email from his Knicks account to djones@torontoraptors.com with the subject "SYNERGY LOGIN."  The email contained a link to synergysportstech.com.

48.     Synergy Sports Technology, LLC ("Synergy") is a third-party provider that the Knicks pay to gain access to proprietary technology allowing searching, analyzing, repurposing, sharing and archiving digital video content and related metadata of basketball games, including proprietary play-type statistics ("Synergy Services").

49.     The Knicks entered into a license agreement with Synergy in January 2022.  The Knicks employ Synergy Services to compile compilations of video and data that the team can review, edit and notate to gain a competitive advantage.

---

[1] *See Nat'l Football Scouting, Inc. v. Rang*, 912 F. Supp. 2d 985, 995–96 (W.D. Wash. 2012) (concluding that scouting reports of players' abilities are potentially protectable under trade secret law); *see also* Matthew J. Frankel, Hackers Strike Out: Recent Cases of Alleged Sports Analytics IP Theft, 1 J. SPORTS ANALYTICS 83, 84 (2015) (noting the sensitivity of a "team's confidential player-evaluation programs").

[2] Lara Grow and Nathaniel Grow, *Protecting Big Data in the Big Leagues: Trade Secrets in Professional Sports*, 74 Wash. & Lee L. Rev. 1567, 1605 (2017), available at https://scholarlycommons.law.wlu.edu/wlurlr/vol74/iss3/7.

50.     Azotam shared a link to his Synergy account with the Raptors Defendants, allowing them to gain unauthorized access to Synergy Services, at the expense of and to the detriment of the Knicks organization.

51.     Synergy permits the Knicks to edit game films, create bespoke film compilations, type notes, and add commentary to the provided game film.

52.     The Knicks' edited game films reflect the knowledge, expertise, labor and skills of the Knicks' scouting apparatus, and thus give the Knicks a competitive advantage over its competitors and are not known or readily ascertainable to anyone outside of the Knicks.

53.     The link would give the Defendants access to this highly proprietary and customized material.

54.     Furthermore, the Raptors Defendants instructed Azotam to misuse his Synergy credentials to collect thousands of video clips of Raptors players.

55.     On August 5, 2023, Azotam shared five separate zip files with Defendant Rajaković and Defendant Lewis through a Knicks-operated Sharepoint file-sharing website.

   a.   Each zip file corresponded to a basketball position and contained video of individual Toronto Raptors players separated into videos of passes and videos of shots.

   b.   The Raptors Defendants viewed and or downloaded the files on August 4 and 5, 2023.

   c.   In total, Azotam illegally shared 3,358 video files.

   d.   The file share site was accessed over 2,000 times by the Raptors Defendants.

56.     Misusing his access to the Knicks database and servers, Azotam conspired with the Raptors Defendants to transfer thousands of files to the Raptors over the course of several days.

57.     The Knicks have an extensive security apparatus designed to keep its files and information confidential.

58.     This security apparatus includes, but is not limited to, a full-time cybersecurity team, active monitoring of any and all potential cybersecurity threats, comprehensive governance, multi-factor authentication to access all internal files, regular security assessments, employee training, point-of-hire acknowledgments of security and confidentiality policies, an information usage policy and an insider theft program that identified the theft at-issue here.

## COUNT ONE

### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA")
### 18 U.S.C. 1030, *ET SEQ.*
### (AGAINST RAPTORS DEFENDANTS)

59.     The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

60.     The Knicks' licensed computer services, including but not limited to the Synergy Services, are a "computer" as defined in 18 U.S.C. § 1030(e)(1).

61.     The Knicks' licensed computer services, including but not limited to the Synergy Services, are and at all relevant times have been used in interstate commerce and communication and are thus a "protected computer" under 18 U.S.C. § 1030(e)(2)(B).

62.     The Raptors Defendants intentionally and without authorization accessed the Knicks' licensed database, including but not limited to the Synergy Services, in order to obtain the Knicks' confidential and valuable information, in violation of 18 U.S.C. § 1030(a)(2)(C).

63.     The Raptors Defendants directed and conspired with Azotam to intentionally and without authorization access the Knicks' licensed database, including but not limited to the Synergy Services, in order to obtain the Knicks' confidential and valuable information in violation of 18 U.S.C. § 1030(b).

64.     The Raptors Defendants intended to use the Knicks' confidential and valuable information for their competitive advantage and profit.

65.     The value of the information obtained exceeds $5,000.

66.     The Raptors Defendants' unauthorized access of the Knicks' licensed database, including but not limited to the Synergy Services, caused losses and damages to the Knicks in an amount to be determined at trial, but no less than $5,000.  *See* 18 U.S.C. § 1030(g).

## COUNT TWO

### VIOLATION OF THE DEFEND TRADE SECRETS ACT ("DTSA")
### 18 U.S.C. § 1832, *ET SEQ.*
### (AGAINST ALL DEFENDANTS)

67.     The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

68.     As set forth above, the Knicks own various trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3), which are critical to the success of their business, including, without limitation, the information described in paragraphs 40-44, 47-55 above.

69.     The Knicks' trade secrets relate to their business as an NBA franchise, which provides services and entertainment across state lines and in foreign commerce. *See* 18 U.S.C. § 1836(b)(1).

70.     The Knicks' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

71.     The Knicks' trade secrets give it a competitive tool against other NBA teams who do not have access to that trade secret information.

72.     The trade secrets the Defendants misappropriated are of enormous potential value to a competing NBA team, like the Raptors.

a. For example, they would allow the Defendants to gain proprietary information about the Knicks' coaching strategies and methodologies for evaluating talent.

b. As another example, these secrets would give a competing team, like the Raptors, an unfair advantage in trying to lure the Knicks' employees away from the Knicks.

73. Disclosure or use of the Knicks' trade secret information to other NBA teams would risk destroying that competitive edge.

74. The Knicks have taken countless steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the extensive information security measures describe in paragraphs 57-58 above, requiring adherence to and acknowledgement of policies as a condition of employment, and requiring employees to sign confidentiality agreements in their employment agreements.

75. The Defendants' actions as described herein constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

76. The Defendants misappropriated the Knicks' trade secrets by acquiring them with knowledge that they had acquired them by improper means, including by theft, misrepresentation, and breaches of Azotam's contractual duty to maintain the secrecy of the Knicks' trade secret information.

77. In wrongfully acquiring the Knicks' trade secrets, Defendants not only knowingly caused Azotam to violate the Knicks' policies governing the dissemination of electronically stored information, but also to breach his contractual duties to the Knicks.

78. The Defendants also misappropriated the Knicks' trade secrets by using or disclosing them without the Knicks' consent.

79.     At the times Azotam copied or disclosed the Knicks' trade secrets, he knew or had reason to know that knowledge of those trade secrets was derived from his or others' use of improper means to acquire those trade secrets; acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets; or derived from or through a person who owed a duty to the Knicks to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

80.     The Defendants' actions have caused and will continue to cause damage to the Knicks and, unless restrained, will further damage the Knicks, the nature and extent of which may not be able to be proven with certainty, irreparably injuring the Knicks and leaving them without an adequate remedy at law.

81.     The Knicks are entitled to damages for actual losses caused by Defendants' misappropriation of its trade secrets, and damages for any unjust enrichment caused by Defendants' misappropriation that is not addressed in computing its actual losses.

82.     In the alternative, the Knicks are entitled to a reasonable royalty for Azotam's misappropriation of their trade secrets.

83.     The Defendants' misappropriation of the Knicks' trade secrets was willful and malicious, entitling the Knicks to attorney's fees and exemplary damages.

84.     Permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of the Knicks' trade secrets.

## **COUNT THREE**

### **MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW (AGAINST ALL DEFENDANTS)**

85.     The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

86.    As set forth above, the Knicks own various trade secrets critical to the success of their business, including, without limitation, the information described in paragraphs 40-44, 47-55 above, which constitute "trade secrets" under New York law.

87.    The Knicks' trade secrets relate to their business as an NBA franchise.

88.    The Knicks' trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

89.    The Knicks' trade secrets give them a competitive advantage over other NBA teams who do not have access to that trade secret information.

90.    The trade secrets the Defendants misappropriated are of enormous potential value to a competing NBA team, like the Raptors.

a.    For example, they would allow the Defendants to gain proprietary information about the Knicks' coaching strategies and methodologies for evaluating opposing teams.

b.    As another example, these secrets would give a competing team, like the Raptors, an unfair advantage in trying to lure the Knicks employees away from the Knicks.

91.    Disclosure or use of The Knicks' trade secret information to other NBA teams would risk destroying that competitive edge.

92.    The Knicks have taken countless steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the extensive information security measures described in paragraphs 57-58 above, requiring adherence to and acknowledgement of policies as a condition of employment, and requiring employees to sign confidentiality agreements in their employment agreements.

93.     By copying and disclosing the Knicks' trade secrets, the Defendants have used the Knicks' trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means, including by theft, misrepresentation, and breaches of Azotam's contractual duty to maintain the secrecy of the Knicks' trade secret information.

94.     The Defendants' actions have caused and will continue to cause damage to the Knicks and, unless restrained, will further damage the Knicks, the nature and extent of which may not be able to be proven with certainty, irreparably injuring the Knicks, leaving it without an adequate remedy at law.

95.     The Knicks are therefore entitled to permanent injunctive relief to prevent such irreparable harm.

96.     The Knicks are entitled to damages as a result of the Defendants' misappropriation to the extent its actual losses are calculable.

## COUNT FOUR

### BREACH OF CONTRACT
### (AGAINST AZOTAM)

97.     The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

98.     Azotam agreed to be bound by the terms of the Employment Agreement.

99.     The Employment Agreement included a valid and enforceable confidentiality provision.  *See* Employment Agreement § 8.

100.     The confidentiality provision required Azotam to maintain in confidence all confidential or proprietary information concerning the Knicks or their businesses or organizations.

101.     "Confidential or proprietary information" is defined to include, among other things, tactics and strategies; economic or commercially sensitive information; trade secrets; play books; scouting reports; draft strategies; trade strategies; and player injuries or medical conditions.

102.    The confidentiality provision also required Azotam to return to the Knicks all confidential or proprietary information following any termination.  It further prohibited Azotam from using or making any such confidential or proprietary information available.

103.    Azotam breached the Employment Agreement by transferring thousands of the Knicks' files, including confidential or proprietary information, to the Raptors Defendants.  In doing so, Azotam failed to maintain in confidence all confidential or propriety information.

104.    Azotam further breached the Employment Agreement by failing to return all confidential or proprietary information to the Knicks following his termination, and by using or making confidential or proprietary information available to the Raptors Defendants.

105.    The Knicks fully performed and discharged all duties they had under the Employment Agreement.

106.    As a result of Azotam's breaches of contract, the Knicks have been damaged in an amount to be proven at trial.

## COUNT FIVE

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(AGAINST RAPTORS DEFENDANTS)**

107.    The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

108.    Azotam had valid and enforceable contracts with the Knicks in the form of the Employment Agreement and the Amendment.

109.    The Raptors Defendants knew or should have known of the valid contracts between the Knicks and Azotam.

110.    The Raptors Defendants are sophisticated and well aware of the industry practice of securing confidentiality agreements.

111.    The Raptors Defendants procured Azotam's breaches of the aforementioned contracts, as applicable.

112.    The Knicks have been damaged by Azotam's breach because the breach has caused the Knicks' direct competitor, the Raptors, to have unauthorized access to the Knicks' confidential and proprietary information.

113.    Azotam's and the Raptors Defendants' conduct has caused and, unless restrained by this Court, will continue to cause the Knicks irreparable injury.  The Knicks have no adequate remedy at law for Azotam's breaches of contract and the Raptors Defendants' tortious interference with contractual relations.

### COUNT SIX

**CONVERSION**
**(AGAINST ALL DEFENDANTS)**

114.    The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

115.    The Knicks had legal ownership and a superior right of possession to each of the files referenced above.

116.    The Defendants exercised unauthorized dominion over those files that rightfully belonged to the Knicks.

117.    The Defendants' unlawful possession of the Knicks' valuable confidential business information and trade secrets was to the exclusion of the Knicks' rights and inconsistent with the Knicks' private possession.

118.    As a direct and proximate result of the Defendants' unauthorized actions, the Knicks have been and are being harmed.  The Defendants are still in possession of the Knicks' valuable confidential business information and trade secrets and are able to access and use this information for their own personal gain and for the benefit of the Knicks' competitors.

119.     Azotam has shared, or plans to share, this confidential information with others who may use, or are using, the information to the Knicks' detriment.

120.     The Knicks are entitled to damages as a result of the Defendants' misappropriation to the extent their actual losses are calculable.

## COUNT SEVEN

### UNFAIR COMPETITION
### (AGAINST ALL DEFENDANTS)

121.     The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

122.     By misappropriating the Knicks' valuable confidential business information and trade secrets, which include the Knicks' labors, skills, and expenditures, the Raptors Defendants have competed unfairly in violation of the common law of New York, as preserved by N.Y. Gen. Bus. Law § 360-O.

123.     Azotam, and the Raptors Defendants, acted in bad faith.

124.     Azotam, and the Raptors Defendants, acted willfully and deliberately.

125.     The Knicks are entitled to damages as a result of the Defendants' misappropriation to the extent their actual losses are calculable.

126.     The Defendants' conduct has caused and, unless restrained by this Court, will continue to cause the Knicks irreparable injury.  The Knicks have no adequate remedy at law for the Defendants' deliberate infringement.

## COUNT EIGHT

### UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

127.     The Knicks repeat and reallege the foregoing allegations as if fully set forth herein.

128.    The Defendants have received substantial benefits from their deliberate and unlawful use of the Knicks' valuable confidential business information and trade secrets but have not compensated the Knicks for the benefits the Defendants received.

129.    The Defendants' receipt of the above benefits and profits constitutes unjust enrichment.

130.    Equity and good conscience militate against permitting the Defendants to retain or use the Knicks' confidential information.

131.    The Knicks are entitled to damages as a result of the Defendants' misappropriation and use of the Knicks' information to the extent their actual losses are calculable.

## PRAYER FOR RELIEF

WHEREFORE, the Knicks seek judgment against the Defendants as follows:

i.    Grant a permanent injunction (i) ordering Defendants to refrain from engaging in further acts of misappropriation of any of the Knicks' proprietary, confidential and/or trade secret information obtained from the Knicks' computer systems; (ii) ordering Defendants to refrain from using, copying, reviewing or disclosing any of the Knicks' proprietary, confidential and/or trade secret information obtained from the Knicks' computer systems; (iii) ordering Defendants to account for any and all of the Knicks' proprietary, confidential and/or trade secret information currently in their custody or control, or in the alternative, produce for immediate inspection and imaging all computers and/or other electronic devices belonging to, under the control of, accessible to, or operated by Azotam, including Azotam's home computer(s) and/or other electronic devices capable of transmitting and/or storing information;

ii.    Enter a judgment that Defendants' violations and breaches were willful and malicious;

iii.    Find that Azotam can have no benefit as a result of his misappropriation and wrongful

         acts;

iv.     Compensatory and other damages in amounts to be determined at trial;

v.      Exemplary damages;

vi.     Disgorgement damages;

vii.    An award of reasonable attorneys' fees and costs incurred in this action; and

viii.   Any such further relief as this Court deems just and proper.


Dated: New York, New York                    By: */s/ Jim Walden*
         August 21, 2023                               Jim Walden
                                                       Daniel J. Chirlin
                                                       Hannah Belitz
                                                       WALDEN MACHT & HARAN LLP
                                                       250 Vesey Street, 27th Floor
                                                       New York, NY 10281
                                                       Tel.: (212) 335-2030
                                                       Fax: (212) 335-2040

                                                       *Attorneys for Plaintiff New York Knicks,*
                                                       *LLC.*