UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK KNICKS, LLC,<br><br>                              Plaintiff,<br><br>                -against-<br><br>MAPLE LEAF SPORTS &<br>ENTERTAINMENT LTD. d/b/a TORONTO<br>RAPTORS, DARKO RAJAKOVIĆ, NOAH<br>LEWIS, IKECHUKWU AZOTAM, and JOHN<br>DOES 1-10,<br><br>                              Defendants. | 23-CV-7394 (JGLC)<br><br>**<u>OPINION AND ORDER</u>** |

JESSICA G. L. CLARKE, United States District Judge:

The New York Knicks allege that the Toronto Raptors poached a former Knicks

employee and directed that employee to steal the Knicks' confidential information on his way

out, all in an effort to give the Raptors a competitive advantage. The truth or falsity of that

allegation is not the question at this stage. Instead, the question before the Court is where this

case should proceed: either in this Court or in arbitration before the Commissioner of the

National Basketball Association (the "NBA"). The answer hinges on the arbitration clause in the

NBA Constitution, which purports to give the NBA Commissioner exclusive jurisdiction over

any dispute involving two NBA teams. Based on Second Circuit precedent construing similarly

broad arbitration clauses, the determination of whether this dispute is arbitrable is one for the

NBA Commissioner, not the Court. Thus, the Court GRANTS Defendants' motion to compel

arbitration.

## BACKGROUND

Plaintiff New York Knicks, LLC (the "Knicks" or "Plaintiff") brings this action against

Defendants Maple Leaf Sports & Entertainment Ltd. d/b/a Toronto Raptors (the "Raptors") and

Darko Rajaković, Noah Lewis, Ikechukwu Azotam, and John Does "1" through "10" (unknown Raptors employees) (collectively, the "Individual Defendants," and together with the Raptors, the "Defendants"), alleging that Defendant Azotam, a former Knicks employee and current employee of the Raptors, misappropriated the Knicks' confidential and proprietary information at the behest of the Raptors, Rajaković, and Lewis (collectively with the John Doe Defendants, the "Raptors Defendants"). ECF No. 1 ("Complaint" or "Compl.") ¶¶ 1, 19. The Knicks bring claims for: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*; (2) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832, *et seq.*; (3) misappropriation of trade secrets under New York common law; (4) breach of contract; (5) tortious interference with contractual relations; (6) conversion; (7) unfair competition; and (8) unjust enrichment. *Id.* ¶¶ 59–131; *see also* ECF No. 35 ("Opp.") at 4–5.

Before the Court is Defendants' motion to compel arbitration, ECF No. 21 ("Motion" or "Mot.") and motion to seal an exhibit (Azotam's employment agreement with the Knicks) filed in support of the Motion, ECF No. 23. The following facts are not in dispute.

## I.    The NBA Constitution, the Commissioner, and the Arbitration Clause

The Knicks and Raptors are professional basketball teams that are members of the National Basketball Association (the "NBA" or "League" or "Association"). Compl. ¶¶ 15–16; Mot. at 4. As members of the NBA, the Knicks and Raptors are governed by the NBA Constitution and By-Laws, a contract among the members of the Association, as well as the "rules, regulations, resolutions, and agreements of the Association." *See* ECF No. 25-1 ("NBA Constitution" or "NBA Const."), Art. 2. The NBA Constitution provides that, "[f]or purposes of this Constitution and By-Laws, an action on behalf of a Member by any of its Owners,

employees, officers, directors, managers, agents or representatives . . . shall be the action of a Member." *Id.* at 2.

The Commissioner of the NBA (the "Commissioner"), the Chief Executive Officer of the League, is elected by the NBA's Board of Governors, on which each member of the League is represented. NBA Const., Arts. 18(b), 24(a). The current NBA Commissioner is Adam Silver. Opp. at 18. The NBA Constitution provides that the Commissioner "shall have exclusive, full, complete, and final jurisdiction of any dispute involving two (2) or more Members of the Association." NBA Const., Art. 24(d). It further provides that "all actions duly taken by the Commissioner pursuant to this Article 24 or pursuant to any other Article or Section of the Constitution and By-Laws, which are not specifically referable to the Board of Governors, shall be final, binding and conclusive, as an award in arbitration, and enforceable in a court of competent jurisdiction in accordance with the laws of the State of New York." *Id.*, Art. 24(m) (together with Art. 24(d), the "Arbitration Clause").

## II.      The Individual Defendants

Defendants Darko Rajaković, Noah Lewis, and Ikechukwu Azotam are currently employed as the Raptors' head coach, assistant video coordinator and player development coach, and head of video and player development assistant, respectively. Compl. ¶ 1; Mot. at 5.

## III.      Azotam's Employment with the Knicks

Prior to his employment with the Raptors, Azotam worked for the Knicks as an Assistant Video Coordinator and later, after being promoted, as a Director of Video/Analytics/Player Development Assistant. Compl. ¶¶ 19, 26. In the latter role, the Complaint states that Azotam "oversaw the Assistant Video Coordinators and was responsible for planning, organizing and

distributing all video scouting responsibilities for the Knicks coaching staff." *Id*. ¶ 27. Azotam

was employed by the Knicks beginning on October 5, 2020. *Id*. ¶ 25.

In his employment agreement with the Knicks, Azotam agreed "that he shall be bound

and governed by the Constitution and By-Laws, rules, regulations, resolutions and agreements of

the NBA . . . ." ECF No. 24-2 (the "Employment Agreement") § 6(G). The confidentiality

provision of the Employment Agreement required that Azotam "maintain in strictest confidence

all confidential or proprietary information concerning the [Knicks] or its businesses or

organizations (in any form including, without limitation, confidential or proprietary

information . . .)," including "tactics and strategies; economic or commercially sensitive

information, policies, practices, procedures or techniques; trade secrets; play books; scouting

reports; draft strategies; [and] trade strategies." *Id*. § 8 (the "Confidentiality Provision"). With

respect to any breach of the agreement by Azotam, the contract provides that the Knicks "shall

have the right to obtain, from any court having jurisdiction, such equitable relief as may be

appropriate . . . ." *Id*. § 13. The agreement contains a forum selection clause, which provides that

Azotam "irrevocably submits to the jurisdiction of the courts of the State of New York and the

federal courts of the United States of America located in the State of New York, and [Azotam]

hereby waives and agrees not to assert as a defense that [Azotam] is not subject thereto or that

the venue thereof may not be appropriate." *Id.* § 16(B) (the "Forum Selection Clause").

## IV.  Azotam's Alleged Misappropriation of the Knicks' Confidential Information on Behalf of the Raptors Defendants

The Knicks allege that, in July 2023, Azotam and the Raptors Defendants began

discussing Azotam's potential employment with the Raptors and that "Defendant Rajaković and

the other Raptor Defendants recruited and used Azotam to serve as a mole within the Knicks

organization to convey information that would assist the Raptors Defendants in trying to manage

4

their team." Compl. ¶¶ 37–38. The Complaint further alleges that in early August 2023, while he was still working for the Knicks, "Azotam began to illegally convert and misappropriate the Knicks' confidential and proprietary data. This theft of data was done at the direction of Defendant Rajaković and the Raptors Defendants." *Id*. ¶ 39. Specifically, the Knicks allege that Azotam sent emails from his Knicks email address to his new Raptors and personal email addresses with confidential Knicks documents, including scouting reports, play frequency data, opposition research, opposing play tendencies, lists and diagrams of opponents' key plays, and the Knicks' prep book. *Id*. ¶¶ 40–44. Azotam allegedly sent an email to the Raptors with a link to third-party licensed software that allowed Defendants to access proprietary compilations of NBA game film, and according to the Complaint, Azotam shared over 3,000 video files with Rajaković and Lewis through a Knicks-operated file-sharing website. *Id*. ¶¶ 47–55.

The Knicks allege that Azotam left the Knicks and began his current employment with the Raptors, as head of video and player development assistant, in or around August 14, 2023. *Id*. ¶ 32.

## V.    Pre-Litigation Correspondence Between the Knicks and Raptors

On August 17, 2023, the Knicks' general counsel wrote a letter to the chairman of the Raptors, alleging that Azotam and the Raptors were in "illegal possession of more than 3,300 files containing proprietary scouting information compiled by the Knicks" and demanded that the Raptors "immediately destroy" more than 3,300 video files, provide a signed affidavit attesting to having done so, provide the Knicks access to the Raptors' electronic files, direct Azotam to sit for an interview with the Knicks, provide the Knicks a full accounting of all Knicks' proprietary files in its possession, and agree to preserve all data on personal and company electronic devices containing communications with Azotam. ECF No. 25-3 (the "August 17 Letter"); Mot. at 7.

On August 18, 2023, the Raptors' chief legal officer emailed the Knicks' general counsel, stating that the Raptors did not know "what information if any that Mr. Azotam has relating to his work with the [Knicks]," and that the Raptors have "no interest in any of the information" described in the August 17 Letter. ECF No. 25-4. The email stated that the Raptors would meet with Azotam "to determine what if any information he has" before advising the Knicks on how the Raptors intended to proceed. *Id*. The Raptors promised to take steps to preserve any relevant records and expressed an intent "to cooperate [with the Knicks] to address the concerns . . . raised." *Id*.

## VI.   Procedural History and Correspondence with the NBA

On August 21, 2023, the Knicks filed the instant lawsuit. ECF No. 1. Less than a week later, the Raptors' chief legal officer wrote to Rick Buchanan, the NBA's general counsel, to request that the NBA Commissioner exercise jurisdiction over the subject matter of this lawsuit pursuant to Article 24(d) of the NBA Constitution. ECF No. 25-5.

The Knicks' general counsel opposed the Raptors' request that the Commissioner exercise jurisdiction. ECF No. 25-7. Buchanan advised the Knicks and Raptors by email that the "league will abide further proceedings in the S.D.N.Y. court for a determination of whether this dispute should be adjudicated in federal court or before the Commissioner." ECF No. 25-8. In a subsequent email, Buchanan further advised the Knicks and Raptors by email that "the NBA has issued no determination as to whether the Knicks-Raptors dispute should be adjudicated in federal court or before the Commissioner" and that, "[a]s stated previously, [the NBA] will abide further proceedings in the S.D.N.Y. court for a determination of this threshold issue." ECF No. 25-9.

On October 16, 2023, Defendants filed the instant motion to compel arbitration. ECF No. 21.

## LEGAL STANDARD

The Federal Arbitration Act (the "FAA") "reflects a liberal federal policy favoring arbitration agreements and places arbitration agreements on the same footing as other contracts." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017) (cleaned up). Under Section 2 of the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA provides that parties can petition a district court for an order compelling arbitration. 9 U.S.C. § 4. The role of the courts is "limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate." *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120 (2d Cir. 2003) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996)).

"Arbitration is a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes – that the parties have agreed to submit to arbitration." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 316 (2d Cir. 2021) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)) (internal quotation marks omitted). "Ordinary principles of contract law guide the inquiry into whether an arbitration agreement was validly formed and whether the parties consented to arbitrate a particular dispute." *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) (internal citation omitted); *see also Kaplan*, 514 U.S. at 944. In determining whether parties agreed to arbitrate, courts "look to state contract law principles." *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019) (quoting *Nicosia v.*

7

*Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)) (internal quotation marks omitted). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983); *see also DDK Hotels*, 6 F.4th at 317.

In considering a motion to compel arbitration, "courts apply a standard similar to that applicable for a motion for summary judgment," deciding whether there is an issue of fact as to the making of the agreement to arbitrate based on "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits." *Nicosia*, 834 F.3d at 229 (cleaned up). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000). It may not satisfy this burden through "general denials of the facts on which the right to arbitration depends . . . but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

## DISCUSSION

Per the terms of the Arbitration Clause, the Court applies New York law to this case. *See* NBA Const., Art. 24(m). First, the Court finds that the Arbitration Clause in the NBA Constitution represents a valid agreement to arbitrate at least some disputes. Next, the Court finds that the broad language of the Arbitration Clause requires an arbitral determination of arbitrability. The Court then considers the Knicks' attempts to challenge the enforceability of the Arbitration Clause itself, concluding that none of these challenges have merit. Thus, the Court compels arbitration and stays the case. Finally, the Court permits limited redaction to Azotam's Employment Agreement with the Knicks, but otherwise denies the motion to seal.

## I.      There Is No Dispute that a Valid Arbitration Agreement Exists

Although no party disputes this issue, the Court first addresses whether a valid arbitration agreement exists. *See Davitashvili v. Grubhub Inc.*, No. 20-CV-3000 (LAK), 2023 WL 2537777, at *5 (S.D.N.Y. Mar. 16, 2023) (noting that the movant bears the initial burden of demonstrating the existence of a valid agreement to arbitrate). The NBA Constitution provides that the Commissioner "shall have exclusive, full, complete, and final jurisdiction of any dispute involving two (2) or more Members of the Association." NBA Const., Art. 24(d). Although this provision does not expressly state that it is an arbitration clause, that is precisely what it is. Courts have found similar provisions to be arbitration clauses where, as here, the provision grants a non-judicial arbiter "exclusive jurisdiction" over disputes. *See Dziennik v. Sealift, Inc.,* No. 04-CV-1244 (DLI), 2023 WL 3765053, at *4 (E.D.N.Y. June 1, 2023) (collecting cases); *Dynamic Int'l Airways, LLC. v. Air India Ltd.*, No. 15-CV-7054 (PKC), 2016 WL 3748477, at *8–9 (S.D.N.Y. July 8, 2016) (applying New York law and finding agreement that assigned resolution of "any difference/dispute" to a designated non-judicial authority "whose decision shall be final and binding on both parties" to be a "valid and enforceable agreement to arbitrate"). Moreover, the NBA Constitution provides that "all actions duly taken by the Commissioner pursuant to this Article 24 . . . shall be final, binding and conclusive, as an award in arbitration . . . ." NBA Const., Art. 24(m). The Court is therefore satisfied that the relevant provisions of the NBA Constitution represent a valid agreement to arbitrate.

## II.     The Parties Have Agreed to Arbitrate the Threshold Question of Arbitrability

Defendants seek "an arbitral rather than judicial determination of arbitrability." *See The Republic of Iraq v. BNP Paribas USA*, 472 F. App'x 11, 13 (2d Cir. 2012). "Threshold questions of arbitrability, such as whether the arbitration agreement applies to a particular dispute, presumptively should be resolved by the court and not referred to the arbitrator." *DDK Hotels*, 6

F.4th at 317 (internal citation and quotation marks omitted). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* (internal citation and quotation marks omitted). "In determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative." *Id*. at 318 (internal citation omitted). The party seeking to compel arbitration of arbitrability bears the burden of establishing "clear and unmistakable expression of the parties' intent to submit arbitrability disputes to arbitration." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1032 (2d Cir. 2014); *see also DDK Hotels*, 6 F.4th at 323.

As is the case here, "rarely do arbitration agreements directly state whether the arbitrator or the court will decide the issue of arbitrability. In the absence of language that directly addresses the issue, courts must look to other provisions of the agreements to see what contractual intention can be discerned from them." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 191 (2d Cir. 2019). Notwithstanding an agreement to arbitrate "all disputes," the Second Circuit has assessed whether the parties intended to arbitrate arbitrability by examining several factors, including: (1) the breadth of the agreement to arbitrate; (2) whether the parties intended to arbitrate the particular dispute presented[1]; (3) whether the parties have incorporated the

---

[1] In *Henry Schein, Inc. v. Archer & White Sales, Inc.*, the Supreme Court reaffirmed that courts "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." 586 U.S. 63, 72 (2019) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). The Second Circuit has clearly stated that *Henry Schein* "does not prohibit a court considering whether an arbitration agreement confers authority over arbitrability on the arbitrators from considering whether the agreement calls for arbitration of the dispute. Instead, *Henry Schein* simply makes clear that where the parties have agreed to submit arbitrability to arbitration, courts may not ignore such agreement and take the issue out of arbitration on the theory that the claim of arbitrability is itself groundless. But this does not prevent courts properly addressing the delegation issue from applying ordinary contract principles and considering all pertinent evidence, including evidence that the parties intended to litigate a particular category of disputes." *LAVVAN, Inc. v. Amyris, Inc.*, No. 21-1819, 2022 WL 4241192, at *2 (2d Cir. Sept. 15, 2022) (quoting *Bucsek*, 919 F.3d at 195) (cleaned up).

procedural rules of an arbitral body which empower an arbitrator to decide issues of arbitrability; (4) the presence of qualifying provisions that limit the scope of what is delegated to the arbitrator or exclude certain proceedings from arbitration; and (5) the presence of provisions waiving the right to sue or seek remedies in court. *See id.*; *see also DDK Hotels*, 6 F.4th at 318–19; *Bybyk*, 81 F.3d at 1199. The Court weighs these considerations in the following discussion, concluding that the parties clearly and unmistakably agreed to arbitrate the threshold question of arbitrability.[2]

### A.  The Breadth of the Arbitration Clause and Intention to Arbitrate the Dispute Presented

The breadth of the Arbitration Clause, which appears to apply directly to this dispute, weighs heavily in favor of a finding that the Commissioner must determine arbitrability. "Broad language expressing an intention to arbitrate all aspects of all disputes supports the inference of an intention to arbitrate arbitrability, and the clearer it is from the agreement that the parties intended to arbitrate the particular dispute presented, the more logical and likely the inference that they intended to arbitrate the arbitrability of the dispute." *Bucsek*, 919 F.3d at 191. The Second Circuit has found that – when coupled with the lack of a "qualifying provision" that at least arguably exempts the present dispute from arbitration – "a broad arbitration clause [that] expressly commits all disputes to arbitration" constitutes clear and unmistakable evidence of the parties' intent to arbitrate the question of arbitrability. *NASDAQ*, 770 F.3d at 1031. Under such circumstances, "*all* disputes necessarily includes disputes as to arbitrability." *Id.*; *see also Rochdale Vill., Inc. v. Pub. Serv. Emp. Union, Local No. 80, Int'l Bhd. of Teamsters*, 605 F.2d

---

[2] Contrary to the Knicks' suggestion, *see* Opp. at 6–7, it has no bearing on the Court's ensuing analysis that the NBA has decided to "abide further proceedings in [this Court] for a determination of whether this dispute should be adjudicated in federal court or before the Commissioner." ECF No. 25-8. The Raptors' grumbles about this case attracting publicity, as the Raptors acknowledge, are also "irrelevant for this motion." ECF No. 40 at 6–7; ECF No. 22 at 6 n.7.

1290, 1296 (2d Cir. 1979) (determining that "any and all disputes" is an "all-inclusive phrase" requiring that "[a]ll disputes arising 'under' the agreement are to be arbitrated").

Here, the Arbitration Clause purports to apply to "any dispute" involving two or more members of the NBA. The instant dispute plainly involves two members of the NBA, namely, the Knicks and Raptors. The Knicks concede that the "any dispute" language of the Arbitration Clause is broad, and in fact, the Knicks characterize it as "infinite" in scope. Opp. at 6, 10–12. The "any dispute" language therefore supports the inference that the parties intended for a dispute about arbitrability to be resolved by the Commissioner.

The fact that this action also involves a breach of contract claim between Azotam and the Knicks does not change this result. As further explained in the following section, *see infra* section III(A), the Knicks' attempt to characterize this claim as a purely internal dispute that does not involve the Raptors is unavailing, *see* Opp. at 23–24. By its own terms, the claim at issue expressly involves the Raptors. *See* Compl. ¶ 103 ("Azotam breached the Employment Agreement by transferring thousands of the Knicks' files, including confidential or proprietary information, to the Raptors Defendants."). As such, the Arbitration Clause appears to encompass this dispute, which weighs in favor of an arbitral determination of arbitrability.

### B.  The Incorporation of Procedural Rules

Contrary to the Knicks' position, the fact that the Arbitration Clause does not expressly incorporate arbitral rules that empower the Commissioner to decide issues of arbitrability is not dispositive. *See* Opp. at 8–9. In *DDK Hotels*, the Second Circuit held that broad language in an arbitration clause encompassing "all disputes" – when coupled with incorporation of arbitral rules delegating the question of arbitrability to the arbitrator – is *sufficient* to provide clear and unmistakable evidence of the parties' intention to arbitrate arbitrability. 6 F.4th at 319. It does not

follow, nor does Second Circuit precedent hold, that incorporation of such arbitral rules is *necessary* to satisfy the "clear and unmistakable" test. *See NASDAQ*, 770 F.3d at 1031 (noting that incorporation of arbitral rules is one way to show the parties' intention to arbitrate arbitrability); *Bybyk*, 81 F.3d at 1201–02 (finding that arbitral rules were not incorporated by reference but that the parties nonetheless agreed to arbitrate arbitrability); *Katalyst Sec., LLC v. Marker Therapeutics, Inc.*, No. 21-CV-8005 (LTS), 2022 WL 704427, at *3 (S.D.N.Y. Mar. 9, 2022) (collecting cases) (finding that arbitration clause delegating resolution of "all disputes" to arbitration "itself [] provides clear and unmistakable evidence of the Parties' intent to delegate the question of arbitrability to the arbitrator.").

Here, it is undeniable that the language in the Arbitration Clause requiring arbitration of "any dispute" between the Knicks and Raptors sweeps broadly. The Knicks have not pointed to "other aspects of the contract" – that is, provisions of the NBA Constitution – that "create ambiguity as to the parties' intent" to arbitrate arbitrability. *DDK Hotels*, 6 F.4th at 318.

### C.  Presence of Provisions that Limit the Scope of Arbitration

The Knicks point to no provisions in the NBA Constitution that limit the scope of what is delegated to the Commissioner, exclude certain proceedings from arbitration, or waive the right to sue or seek remedies in court. Instead, they point to the Forum Selection Clause in Azotam's Employment Agreement with the Knicks. Opp. at 21–23. This provision, however, does not affect the parties' agreement to arbitrate the question of arbitrability for several reasons.

First, the Forum Selection Clause in the Employment Agreement does not supersede the Arbitration Clause in the NBA Constitution. "As a matter of black letter contract law, parties cannot modify a contract without the assent of all parties to the contract. Accordingly, a later contract's forum-selection clause cannot supersede a prior contract's choice of forum clause

when not all parties to the prior agreement signed the later one." *Wildfire Prods., L.P. v. Team Lemieux LLC*, No. CV 2021-1072 (PAF), 2022 WL 2342335, at *7 (Del. Ch. June 29, 2022) (quoting *Brooklyn Union Gas Co. v. NewFields Companies, LLC*, No. 19-CV-6363 (EK), 2020 WL 7770993, at *5 (E.D.N.Y. Dec. 30, 2020)) (cleaned up). Applying this principle, the Delaware Court of Chancery held in *Wildfire Prods* that a later agreement between the litigating parties – to which the National Hockey League (the "NHL") was not party – "does not abrogate the NHL's express contractual right granting the Commissioner full and exclusive jurisdiction to arbitrate this dispute under the NHL Constitution . . . ." *Id*. The NBA Constitution is a contract among the members of the League, including the Raptors. *See* NBA. Const., Art. 2. The Raptors were not party to the Knicks' Employment Agreement with Azotam; thus, it cannot supersede the Arbitration Clause in the NBA Constitution with respect to disputes involving the Raptors.[3]

Second, the lack of an express arbitration clause in the Employment Agreement does not nullify the Knicks and Raptors' agreement that the Commissioner has the exclusive right to arbitrate disputes between members. *Wildfire Prods.*, 2022 WL 2342335, at *9 (noting that the "the decision not to include an arbitration provision" in a later agreement between the litigating parties was immaterial because "[n]owhere in the [agreements] did the NHL indicate it was waiving its contractual right to require members to arbitrate disputes"). Again, because the Raptors were not party to the Employment Agreement, the dispute resolution provisions in that contract, which govern purely internal disputes between the Knicks and Azotam arising under

---

[3] The Supreme Court's recent decision in *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024) does not change this conclusion. There, the Supreme Court addressed the question: "[w]hat happens if parties have multiple agreements that conflict as to the . . . question of who decides arbitrability?" *Id*. at 1193. "As always, traditional contract principles apply," including the black letter contract law set forth above. *Id*. Here, the parties do not have multiple agreements regarding who should decide arbitrability of disputes involving the Raptors. As noted above, the Raptors were not party to the Knicks' Employment Agreement with Azotam.

that agreement, cannot supersede the Arbitration Clause in the NBA Constitution with respect to disputes involving the Raptors.

Third, the Knicks' construction, *see* Opp. at 21–23, "that litigation in New York courts is the exclusive forum for all disputes related to the [Employment Agreement]" – including those that involve another NBA team – "completely reads the arbitration clause out of the [NBA Constitution] and, therefore, is not preferred and will be avoided." *All Premium Contractors Inc. v. Sunlight Fin. LLC*, No. 23-CV-5059 (JLR), 2023 WL 6928777, at *5 (S.D.N.Y. Oct. 19, 2023) (internal citation and quotation marks omitted) (noting with respect to dueling arbitration clause and forum selection clause that "[a] court should avoid interpretations of contracts that render terms of a contract 'meaningless or useless'"); *see also Schwartz v. Sterling Ent. Enters., LLC*, No. 21-CV-1084 (PAC), 2021 WL 4321106, at *6 (S.D.N.Y. Sept. 23, 2021) (reconciling arbitration and forum selection clauses in favor of finding an agreement to arbitrate because the plaintiff's "strained reading would not comport with the requirement to reconcile apparent conflicts where reasonably possible, as it would completely read [the arbitration clause] out of the [contract]"). The more natural construction, which gives effect to both the Arbitration Clause and the Forum Selection Clause, is that disputes between Azotam and the Knicks under the Employment Agreement *that do not involve other members of the NBA* are to be litigated in the New York courts.

Thus, the Knicks have not identified contractual provisions that create ambiguity as to the parties' intent with respect to the scope of the Arbitration Clause. *See DDK Hotels*, 6 F.4th at 318. Accordingly, the broad language of the Arbitration Clause – coupled with the absence of any qualifying provisions that arguably exempt the present dispute from arbitration – weighs in favor of an arbitral determination of arbitrability. *See NASDAQ*, 770 F.3d at 1031.

III.     **The Knicks Do Not Convincingly Challenge the Enforceability of the Arbitration Clause as Applied to the Instant Dispute**

In *Gingras v. Think Fin., Inc*., the Second Circuit found that, although "on its face" an arbitration clause appeared to "give the arbitrator blanket authority over the parties' disputes," it was proper for the district court to decide the question of arbitrability because "[p]laintiffs mount a convincing challenge to the arbitration clause itself." 922 F.3d 112, 126 (2d Cir. 2019). Specifically, plaintiffs in *Gingras* attacked the contract provision delegating authority to the arbitrator as fraudulent, which was "sufficient to make the issue of arbitrability one for a federal court." *Id*.; *see also Grubhub*, 2023 WL 2537777, at *9 (quoting same); *Suski*, 144 S. Ct. at 1194 (quoting *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010)) ("If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court *must* consider the challenge before ordering compliance with that [arbitration] agreement."). The Knicks appear to ask this Court to decide the question of arbitrability on the basis that they make a convincing challenge to the enforceability of the Arbitration Clause. Opp. at 9. The Court addresses these challenges in turn, finding them unavailing.

A.   **"Infinite" Arbitration Clause**

The Knicks rely on a line of cases where courts have declined to apply so-called "infinite" arbitration clauses to disputes that lacked any nexus to the contract that contained the arbitration clause. Opp. at 11–14. Infinite arbitration clauses are contract provisions that, "[i]f enforced according to their terms, [] would require arbitration of *any* claims between [the parties], including claims without any nexus to the agreements containing the clauses." *Grubhub*, 2023 WL 2537777, at *10. In *Grubhub*, the Court held that such arbitration clauses in the terms of use of delivery applications – Grubhub, Uber, and Postmates – "do not apply to plaintiffs' claims to the extent they lack any nexus to the underlying contracts." *Id*. at *11. In other words,

to the extent plaintiffs were suing defendants in capacities other than as users of defendants'
platforms, the Court held that the arbitration clauses did not apply. *Id*.

Similarly, in *McFarlane v. Altice USA, Inc.*, the Court considered an arbitration clause
that "[i]f enforced according to its terms . . . would seem to mandate arbitration of any claim
between the parties, including those without any nexus whatsoever to the agreement containing
the clause." 524 F. Supp. 3d 264, 275 (S.D.N.Y. 2021). The *McFarlane* court concluded that the
arbitration provision in a cable service agreement "cannot be applied to claims lacking a nexus"
to that agreement. *Id*. at 277.

In *Wexler v. AT & T Corp.*, the Court reached a similar conclusion, finding that "no
reasonable person would think that checking a box accepting the 'terms and conditions'
necessary to obtain cell phone service would obligate them to arbitrate literally every possible
dispute he or she might have with the service provider . . . . Rather, a reasonable person would be
expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service
agreement [containing the arbitration clause]." 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016).

Here, the Knicks similarly argue that the Arbitration Clause is too broad to be enforced
because it encompasses "any disputes" involving two or more members of the NBA, even those
disputes that may be "untethered" to basketball and the NBA Constitution. Opp. at 11–12. For
example, the Knicks hypothesize that enforcing the Arbitration Clause according to its terms
would produce the "absurd result[]" of requiring arbitration of a civil assault suit arising from a
physical attack of a Knicks' employee by a Raptors' employee. *Id*. at 12.

However, this dispute has a plain nexus to the NBA Constitution. The alleged theft of
confidential information from an NBA team – including scouting reports, play frequency data,
opposition research, opposing play tendencies, lists and diagrams of opponents' key plays, and

the Knicks' prep book, *see* Compl. ¶¶ 40–44, – for the purpose of affording another team an on-court competitive advantage, plainly relates to NBA basketball and the NBA Constitution. The NBA Constitution charges the Commissioner, the designated arbitrator, "with protecting the integrity of the game of professional basketball and preserving public confidence in the League." NBA. Const. Art. 24(a). Moreover, the NBA Constitution's anti-tampering rules provide:

> No person may, directly or indirectly, (i) entice, induce, persuade or attempt to entice, induce or persuade any Coach, Trainer, General Manager or any other person who is under contract to any other Member of the Association to enter into negotiations for or relating to his services or negotiate or contract for such services or (ii) otherwise interfere with any such employer-employee relationship of any other Member of the Association. The Commissioner, either in his discretion or at the request of any Member who alleges that its employee has been tampered with, shall conduct an investigation into whether a person has violated the anti-tampering rule set forth in the prior sentence.

*Id*., Art. 35A(e). Article 35A further provides that "[t]he Commissioner shall direct the dismissal and perpetual disqualification from any further association with the Association or any of its Members, of any person found by the Commissioner after a hearing to have been guilty of offering, agreeing, conspiring, aiding, or attempting to cause any game of basketball to result otherwise than on its merits." *Id*., Art. 35A(b).

This case is about NBA competition and appears to fall squarely within the type of dispute about cheating to win over which the NBA Constitution vests the Commissioner with exclusive jurisdiction. The Court need not ponder the hypothetical boundaries of the NBA Constitution's Arbitration Clause because this case appears squarely within its intended scope. The Knicks' suggestion that a reasonable team would not see the present dispute as connected in some way to the NBA Constitution is an airball. *See* Opp. at 13–14.

Moreover, as noted previously, "the clearer it is from the agreement that the parties intended to arbitrate the particular dispute presented, the more logical and likely the inference

that they intended to arbitrate the arbitrability of the dispute." *Bucsek*, 919 F.3d at 191. That this particular dispute appears to fall clearly within the Commissioner's jurisdiction as contemplated in the NBA Constitution further militates in favor of an arbitral rather than judicial determination of arbitrability.

The foregoing analysis applies with equal force to the Individual Defendants, who at all relevant times were acting on behalf of the Knicks or Raptors. The claims against all Defendants, including the Individual Defendants, plainly involve two members of the NBA, namely, the Knicks and Raptors. The Complaint's central allegation is that "[t]he Raptors Defendants directed Azotam's actions and/or knowingly benefited from Azotam's wrongful acts." Compl. ¶ 2; *see also id*. ¶ 38 ("Defendant Rajaković and the other Raptor Defendants recruited and used Azotam to serve as a mole within the Knicks organization to convey information that would assist the Raptors Defendants in trying to manage their team."). Thus, the Knicks claims against each Defendant indisputably involve the Raptors. Moreover, as the Knicks appear to recognize, *see* Opp. at 20, an order compelling the Knicks and Raptors to arbitrate the instant dispute would apply with equal force to the other Raptors Defendants, Rajaković and Lewis. The same conclusion follows with respect to Azotam; after all, by the Knicks' own terms, even the breach of contract claim against Azotam expressly involves the Raptors. *See* Compl. ¶¶ 103–04.

Because the present dispute, with respect to all parties, has a clear nexus to the NBA Constitution, any concerns about applying the Arbitration Clause to claims without a nexus to the NBA Constitution do not counsel against compelling arbitration here.

### B.  Statutory Rights under the DTSA and CFAA

The Knicks also argue that arbitration before the Commissioner would not enable them to effectively vindicate their statutory rights because the NBA Constitution imposes a $10 million

damages cap, while the DTSA and CFAA do not cap damages (and, in fact, permit double damages) and the DTSA provides for attorneys' fees for the prevailing party. Opp. at 15–16. The Knicks' argument is based on the principle that "courts will not enforce provisions in arbitration agreements that prevent a party from effectively vindicating their statutory rights and securing their statutory remedies." *Cedeno v. Sasson*, 100 F.4th 386, 396 (2d Cir. 2024); *Am. Fam. Life Assurance Co. of New York v. Baker*, 848 F. App'x 11, 12 (2d Cir. 2021) (same). This challenge fails for several reasons.

First, as a general matter, "[s]tatutory claims are arbitrable unless Congress 'has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Rodriguez-Depena v. Parts Auth., Inc.*, 877 F.3d 122, 123 (2d Cir. 2017) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991)). There is no indication that Congress intended that DTSA and CFAA claims be nonarbitrable; in fact, courts have compelled arbitration of both. *See, e.g.*, *Convergen Energy LLC v. Brooks*, No. 20-CV-3746 (LJL), 2020 WL 5549039, at *27 (S.D.N.Y. Sept. 16, 2020) (granting motion to compel arbitration in suit involving DTSA claim); *iDoc Holdings, Inc. v. Goethals*, No. 21-CV-21540, 2021 WL 2895635, at *3–4 (S.D. Fla. July 9, 2021) (requiring arbitration of CFAA and DTSA claims where valid agreement mandated that all claims arising out of or related to it "shall be subject to binding arbitration"); *Mavel, A.S. v. Rye Dev., LLC*, 626 F. Supp. 3d 331, 335, 344 (D. Mass. 2022) (directing DTSA claim to arbitration); *Detroit IT, LLC v. LSC Holdings, Inc.*, No. 20-CV-12292, 2021 WL 3510844, at *4 (E.D. Mich. Aug. 10, 2021) (granting motion to compel arbitration for dispute involving CFAA claim).

Second, the Arbitration Clause does not restrict, or even mention, the Knicks' right to pursue the DTSA and CFAA claims in arbitration. Nor does it purport to limit recovery of

attorneys' fees. The present case is not akin to cases in which the Second Circuit found that an arbitration clause "take[s] the only available statutory vehicle for vindicating [plaintiff's] rights . . . off the table," *Cedeno*, 2024 WL 1895053, at *7, or "would completely bar [plaintiffs] from raising the claims they wish to bring . . . under . . . federal statutes," *Baker*, 848 F. App'x at 12.

Third, the Knicks cite no cases in which a prospective damages cap in arbitration – rather than a waiver of the right to pursue a species of claim or remedy altogether – was found to prevent effective vindication of statutory rights so as to render an arbitration clause unenforceable.

Fourth, even assuming a $10 million damages cap would apply during arbitration, there is no indication that this threshold would be reached aside from the Knicks' conclusory assertion, *see* Opp. at 16, which does not suffice to convince the Court at a procedural posture akin to summary judgment, *see Nicosia*, 834 F.3d at 229. In any event, the Court need not inquire further into the "damages that would be recovered in the event of success" in order to compel arbitration on the question of arbitrability. *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 238–39 (2013).

Thus, the Knicks' argument regarding their rights under the DTSA and CFAA is not "a convincing challenge to the arbitration clause itself." *Gingras*, 922 F.3d at 126.

**C.  Commissioner Bias**

Finally, the Knicks argue that the Arbitration Clause is unenforceable because the designated arbitrator, Commissioner Adam Silver, is biased due to his relationship with Larry Tanenbaum, a minority owner of the Raptors who serves as Chairman of the NBA Board of Governors. Opp. at 17–19.

First, the attack on the fitness of Commissioner Silver to arbitrate this dispute is premature; it is akin to a complaint about the officiating before the game has even started. As the Knicks acknowledge, *see* Opp. at 18 n.33, "it is well established that a district court cannot entertain an attack upon the qualifications or partiality of arbitrators until after the conclusion of the arbitration and the rendition of an award," *Aviall, Inc. v. Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) (internal citation omitted); *see also Hojnowski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 239 (W.D.N.Y. 2014) (rejecting challenge to NFL Commissioner as arbitrator); *Wildfire Prods.*, 2022 WL 2342335, at \*12 (collecting cases). The exception to this principle when "the [arbitration] agreement is subject to attack under general contract principles," *Aviall,* 110 F.3d at 895, does not apply here because the Court has already rejected all the Knicks' other challenges to the enforceability of the Arbitration Clause.

Second, the cases the Knicks cite on arbitrator bias miss the mark. *See* Opp. at 17–19. *Erving v. Virginia Squires Basketball Club* concerned a team versus third party dispute, which raised the prospect of commissioner bias in favor of the sports team where the commissioner had previously represented the team in legal negotiations. 349 F. Supp. 716, 719–20 (E.D.N.Y.), *aff'd*, 468 F.2d 1064 (2d Cir. 1972) (disqualifying the commissioner of the American Basketball Association as arbitrator of a dispute between star player Julius Erving and an ABA team, where the commissioner was listed as a partner of the law firm representing the team and had negotiated on behalf of the team and the ABA). In *Nostalgic Partners, LLC v. New York Yankees Partnership, et al.*, the Court determined that "[b]ased on the appearance of impropriety, the Commissioner of Major League Baseball should not arbitrate a dispute of claims that are asserted against Major League Baseball." ECF No. 37-1, No. 656724/2020 (N.Y. Sup. Ct. Dec. 17, 2021). These cases are not akin to a member versus member dispute in which the Commissioner and the

League do not stand on, or appear to have a vested interest in favoring, either side of the litigation.

Third, the Knicks' argument at this stage is foreclosed by Second Circuit precedent. The Knicks urge the Court to follow *State ex rel. Hewitt v. Kerr,* 461 S.W.3d 798 (Mo. 2015). *See* Opp. at 17–18. In that case, the Court declined to enforce an arbitration agreement appointing the commissioner of a sports league as the arbitrator due to concerns of impropriety or bias. *Hewitt*, 461 S.W.3d at 813. The plaintiff in that case, Hewitt, an employee of the St. Louis Rams, sued the team for age discrimination, and the Rams moved to compel arbitration pursuant to an arbitration clause in Hewitt's employment contracts designating the NFL commissioner as arbitrator of "any dispute" between Hewitt and the Rams. *Id*. at 804. The Court found that designation of the NFL commissioner as arbitrator was unconscionable under Missouri law because the commissioner, who "is employed by the league; i.e., the team owners," was in a "position of bias" when effectively "required to arbitrate claims against his employers." *Id*. at 813.

*Hewitt* has not persuaded courts in this Circuit. *See, e.g.*, *Flores v. Nat'l Football League*, 658 F. Supp. 3d 198, 218 n.25 (S.D.N.Y. 2023) (declining to follow *Hewitt* and deferring to contrary precedent from the Second Circuit). In the context of litigation arising out of "Deflategate," the Second Circuit rejected the argument that, as a matter of law, the NFL Commissioner cannot fairly arbitrate claims regarding the NFL's conduct. *See Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016). The parties in that case contracted to arbitrate claims before the NFL commissioner "knowing full well . . . that the Commissioner would have a stake both in the underlying discipline and in every arbitration brought"; accordingly, the Second Circuit declined to indulge allegations that

the NFL commissioner could not "adjudicate the propriety of his own conduct." *Id*. While in

some instances "a risk of biased adjudication" results from designation of a league commissioner

as arbitrator, "the FAA cautions against judicial intervention at this early stage when Plaintiff[]

[has], as here, agreed to a particular arbitration structure, including a specific arbitrator. Courts

must avoid presupposing that the selected arbitrator will not serve as a conscientious and

impartial arbitrator." *Flores*, 658 F. Supp. 3d at 216 (internal citations omitted). "Because

arbitration is a matter of contract," and the Knicks agreed in the NBA Constitution to the

jurisdiction of the Commissioner, they cannot at this early stage "ask the Court to provide them

with an arbitrator who is more neutral than the one to whom they agreed." *Id*. at 212; *see also*

*Nat'l Football League Mgmt. Council*, 820 F.3d at 548 ("If it is seriously believed that these

procedures were deficient or prejudicial, the remedy was to address them during collective

bargaining. Had the parties wished to otherwise limit the arbitrator's authority, they could have

negotiated terms to do so.").

Fourth, because the attack on the fitness of Commissioner Silver to adjudicate the instant

member versus member dispute is unpersuasive at this stage, so too is the Knicks' insistence that

fairness concerns require the NBA Constitution to provide a mechanism for appointment of an

alternative arbitrator aside from the one to whom the Knicks already agreed. *See* Opp. at 19.

Finally, if the Commissioner "is, indeed, improperly biased, and that bias prevents him

from fairly adjudicating [the Knicks'] claims, [the Knicks] have a recourse: this Court retains the

authority to review the Commissioner's decision and to vacate the Commissioner's award."

*Flores*, 658 F. Supp. 3d at 212; *see also* 9 U.S.C. § 10(a)(2) (permitting courts to overturn

arbitration decisions where there is "evident partiality or corruption").

For the foregoing reasons, the Knicks' attack on the fitness of Commissioner Silver to adjudicate this dispute, at this juncture, is far from "a convincing challenge to the arbitration clause itself." *Gingras*, 922 F.3d at 126.

## IV.   The Court Compels Arbitration

Having agreed to arbitrate "any disputes" involving two or more members of the NBA, and absent any factors that weigh against an arbitral determination of arbitrability, the Knicks "cannot now disown its agreed-to obligation to arbitrate all disputes, including the question of arbitrability." *Contec Corp. v. Remote Sol.*, Co., 398 F.3d 205, 211 (2d Cir. 2005). The Court finds that there is "clear and unmistakable evidence" that the parties "intended to submit the question of arbitrability to the arbitrator." *Oganesyan v. Tiffany & Co.*, No. 23-CV-4287 (JGLC), 2023 WL 7928098, at *3 (S.D.N.Y. Nov. 16, 2023). Thus, "absent a successful challenge to the delegation provision," the Court "must send all arbitrability disputes to arbitration." *Suski*, 144 S. Ct. at 1194. Accordingly, the Court compels arbitration to determine the threshold issue of arbitrability pursuant to the Arbitration Clause of the NBA Constitution. The case is stayed while the parties arbitrate. *See Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 (1983)) (explaining that a stay rather than dismissal comports with the FAA's underlying policy of moving an arbitrable dispute to arbitration "as quickly and easily as possible").

## V.   The Motion to Seal is Granted in Part and Denied in Part

Defendants seek to seal Azotam's Employment Agreement with the Knicks, which they filed in support of the Motion, in order to protect Azotam's "privacy interest" therein. ECF No. 23 at 3.

"[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to ensure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).[4] First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id*. at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id*. Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id.* at 120.

"Just as with documents submitted in connection with a Motion for Summary Judgment, documents filed in connection to a Motion to Compel Arbitration . . . are judicial documents" to which a strong presumption of public access attaches. *Bernsten*, 307 F. Supp. 3d at 166 (quoting *Lugosch*, 435 F.3d at 126) (internal quotation marks omitted).

The Court must balance "competing considerations" against the weight of the presumption of access. *Lugosch*, 435 F.3d at 120. Courts should also consider the "nature and degree of injury" that may result from disclosure, the "reliability of the information," and "whether the nature of the materials is such that there is a fair opportunity for the subject to

---

[4] Because the *Lugosch* common law framework "is dispositive of the motion to seal, the Court need not undertake the First Amendment analysis." *In re Telegraph Media Grp. Ltd.*, No. 23-MC-215 (JGLC), 2023 WL 5770115, at *6 (S.D.N.Y. Sept. 6, 2023).

respond to any accusations contained therein." *Id.* "If such factors outweigh the value to the public of accessing the document at issue, then that document should be sealed." *Matter of Upper Brook Cos.*, No. 22-MC-97 (PKC), 2023 WL 172003, at *1 (S.D.N.Y. Jan. 12, 2023). Parties "opposing disclosure [of a judicial document] must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Id.*

The Raptors argue that established competing considerations, relating to the interest in business secrecy vis-à-vis commercial rivals and the privacy interests of those resisting disclosure, militate in favor of sealing. ECF No. 23 at 1–2 (quoting *Valassis Commc'ns, Inc. v. News Corp.*, No. 17-CV-7378 (PKC), 2020 WL 2190708, at *1 (S.D.N.Y. May 5, 2020)). "The demonstration of a valid need to protect the confidentiality of sensitive business information, such as pricing and compensation information, may be a legitimate basis to rebut the public's presumption of access to judicial documents." *Valassis Commc'ns,* 2020 WL 2190708, at *3. Of course, the Raptors Defendants have no privacy interest in the Employment Agreement between Azotam and the Knicks. The sealing motion appears to rest on "the personal privacy interests of the relevant employees in the compensation and bonuses received by individual [] employees" – namely, Azotam's privacy interest in the compensation and bonuses he received as a Knicks employee. *Id.* at *4; ECF No. 23 at 2–3. Unlike in *Valassis*, where the individuals subject to potential embarrassment or harm upon disclosure of their compensation and bonuses were third parties, Azotam is a Defendant moving to compel arbitration, with the document subject to the sealing application filed in support of said Motion.

The Court finds that Azotam's privacy interest in the compensation and bonuses he received – information which is not material to disposition of this Motion or the public's ability to understand it – narrowly outweighs the presumption of public access. Thus, redaction of such details in the Employment Agreement (ECF No. 24-2) is permitted. Otherwise, further redaction or sealing of the Employment Agreement – excerpts of which already appear publicly in the memoranda of law and the sealing motion, and on which the Court relies in this Order – is not permitted. Defendants have not satisfied their burden of demonstrating why those portions of the Employment Agreement "are particularly commercially sensitive or how their disclosure would cause serious injury." *Boothbay Absolute Return Strategies, LP v. Belgische Scheepvaartmaatschappij-Compagnie Mar. Belge SA*, No. 24-CV-1445 (JGLC), 2024 WL 1097128, at *9 (S.D.N.Y. Mar. 13, 2024).

**CONCLUSION**

For the reasons set forth herein, Defendants' motion to compel arbitration is GRANTED and Defendants' motion to seal is GRANTED in part and DENIED in part. Defendants are ORDERED to publicly file a version of the Employment Agreement (ECF No. 24-2) that conforms to Section V of this Order no later than **July 5, 2024**.

For the reasons set forth in Section III, the case is hereby STAYED while the parties arbitrate. No later than **December 13, 2024**, the parties shall file a joint letter updating the Court on the status of the arbitration.

If the NBA Commissioner determines that this case is not arbitrable, the parties shall promptly (**within seven days**) inform the Court of such a decision via a joint letter.

The Clerk of Court is directed to STAY the case and terminate ECF Nos. 21 and 23.

Dated: June 28, 2024
　　　　New York, New York

　　　　　　　　　　　　　　　　　SO ORDERED.

　　　　　　　　　　　　　　　　　JESSICA G. L. CLARKE
　　　　　　　　　　　　　　　　　United States District Judge